UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MARILYN WARSINSKE, | ) |
| | ) NO. CV-11-0011-LRS |
| Plaintiff, | ) |
| | ) **ORDER GRANTING DEFENDANTS'** |
| -vs- | ) **SUMMARY JUDGMENT MOTION** |
| | ) |
| LIBERTY NORTHWEST INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**BEFORE THE COURT** is the Defendant's Motion For Summary Judgment (ECF No. 77) and Plaintiff's Motion For Partial Summary Judgment (ECF No. 64). Oral argument was heard on November 29, 2011 in Spokane, Washington. Steven Schneider, Esq., argued on behalf of Plaintiff. Sarah Eversole, Esq., argued on behalf of Defendant.

**I. BACKGROUND**

This case was removed from Spokane County Superior Court based on complete diversity of citizenship between the parties pursuant to 28 U.S.C. §1332 (a) and (c). In her Second Amended Complaint, Plaintiff, Marilyn Warsinske, claims that she was wrongfully denied benefits for a loss under her policy of insurance. Plaintiff also brought a bad faith claim under RCW 48.01.030 and a Washington Consumer Protection Act

ORDER - 1

violation claim.  And while Plaintiff brought suit against two insurance carriers, the policy at issue was between Plaintiff and Defendant Liberty Northwest Insurance Company only. Defendants Safeco Insurance Company and Liberty Mutual Holding Company were voluntarily dismissed by Plaintiff in her Second Amended Complaint on March 3, 2011.

**II.   SUMMARY OF FACTS**

On August 29, 2008, Mrs. Warsinske purchased a Homeowners Policy from Defendant Liberty to insure a residence at 505 E. 14th Ave., Spokane, Washington.  The subject "patio roof" or "canopy"[1] of this lawsuit collapsed under the weight of snow on or about January 15, 2009. After the collapse, in March of 2009, Mrs. Warsinske's architect, Martin Hill, drew plans for a replacement "roof" that covered the full length of the patio.  ECF No. 67, at 4.  The insured Mrs. Warsinske, who acknowledges that her son, Keith Scribner, had authority to communicate on insurance matters, did not report the loss until July 31, 2009.  The insurance adjusters could not view the damage on that date as Plaintiff had already cleaned it up by this time.

While Mr. Scribner alleges that he advised Plaintiff's independent insurance agent Thomas Schweifler of Fidelity Associates in March of 2009 of the damage, Defendant argues that the email referenced to support this claim specifically asked the independent agent not to report the claim

---

[1]Various names for the subject matter of this insurance claim have surfaced during the briefing of the motions: canopy, patio roof, covering, awning, canvas cover, patio cover, pre-loss structure, permanent covered structure, canvas awning, replacement roof, pre-loss deck cover, and deck roof of steel construction.

ORDER - 2

to the insurance company and to "delay" the claim, ECF No. 74, at 62.

In response to the insurer's request for "photographs of the awning and any debris from the awning" following the damage, Mr. Scribner denied that photographs existed or that Mrs. Warsinske's architect Martin Hill, who was working on designing a replacement for the damaged canopy, had any such photographs. ECF No. 74, at 17. Plaintiff also states she did not recall seeing the photograph before and that she had no pre-loss photographs of the patio roof in her possession.[2] It was later discovered, however, that Plaintiff's architect had taken multiple photographs of the collapsed canopy shortly after the date of collapse, in the presence of Scribner. ECF No. 74, at 93-96; ECF No. 87, at 50. It was also discovered that Plaintiff had consulted an architect approximately 4 months prior to the loss concerning modifications to be made to the area which was later damaged.[3]

Mr. Scribner also denied that there were any appraisals on the property while representing that the alleged "patio cover" went the full length of the home. In fact, an appraisal had been done on the premises. The evidence indicates that Mr. Scribner had been the "contact person"

---

[2] ECF No. 67, Fig. 1-Appraisal photograph.

[3] Following the commencement of the subject lawsuit, Liberty obtained a copy of the file maintained by Plaintiff's architect. He explained that the original has been confiscated by the Office of the Insurance Commissioner, criminal investigation unit, due to the criminal investigation that is currently proceeding against Plaintiff. The file contained sketches and notes showing that Plaintiff has been working with the architect since September 5, 2008 (four months before the alleged collapse) on a design for patio roof-evidence that belies Plaintiff's claim that she wasn't familiar with the pre-loss structure. ECF No. 81, at 12.

ORDER - 3

for the appraisal and Ms. Warsinske had paid for the appraisal. ECF No. 87-2. Later, through counsel, Plaintiff represented to Liberty NW that "an appraisal was not required by the bank." ECF No. 74, at 16. Based on these representations, a Liberty employee sent a release to Plaintiff authorizing Liberty to obtain an appraisal and other information needed in Liberty's investigation, directly from the bank, explaining: "If no appraisal was done on the home I will need an authorization from Ms. Warsinske to verify this information with the lender." ECF No. 74, at 22. Although Plaintiff signed the release, every item on the release including the paragraph which would have allowed Liberty to obtain a copy of the appraisal, was crossed out. ECF No. 82, Exh. A.

Additionally, the true length of the canopy was not revealed in a forthright manner. Mr. Scribner described the pre-loss "roof" as running the length and width of the patio. Plaintiff argues in order to meet current building code requirements, her architect/engineer Martin Hill included additional construction in the plans. This consisted of support columns down to the foundation and changes in the roof angle to prevent snow from dropping over the property line. The architect drew the plans for a replacement roof that covered the <u>full</u> length of the patio. The cost estimates submitted by Plaintiff were also for a structure that covered the full length of the patio.

Liberty asserts the aerial photograph, discovered in March of 2010, revealed the pre-loss deck canopy did not extend the full length of the deck. This was inconsistent with Mr. Scribner's descriptions of a pre-loss "roof" running the length and width of the patio and it was also

ORDER - 4

inconsistent with the architectural drawings and cost estimates submitted by Plaintiff.

Plaintiff asserts that in January of 2010, Liberty determined that no exclusions from the policy coverage existed. Plaintiff indicates that coverage was then accepted by the Defendant, and Defendant began processing the payment of the claim. ECF No. 67, at 7. Plaintiff relies heavily on evidence that by February 10, 2010,[4] a Liberty employee, Trevor Evans, had determined that the claim could be paid under the Policy terms, as "weather related collapse damage." But Liberty asserts it relied exclusively on the statements, documents, and omissions provided by Ms. Warsinske and Mr. Scribner in deciding to proceed with the approval of the claim at that point in the claim investigation because Plaintiff had removed all evidence of the loss prior to reporting a claim to Liberty. Of note, Plaintiff had advised Liberty that there were no photographs of the pre-loss structure or of the "debris" so Liberty had no other information upon which it could rely. ECF No. 74 at 14,76.

The claim was ultimately denied in a letter from Ben Steele dated October 13, 2010, referred to as "Denial Letter." In the Denial Letter, Liberty first denied coverage by defining the collapsed structure as an "awning" which is personal property under the policy terms and therefore, not covered for collapse. Defendant Liberty also alleged in the Denial

---

[4]The Court notes that the date in ECF No. 67, at 6 is February 10, 2010 but in ECF No. 85, at 6, the date is February 10, 2011. The Court assumes the latter date reference contains a typographical error.

ORDER - 5

Letter that, even if there was coverage, the policy is void because of misrepresentation, failure to cooperate, and delay.

**III. ANALYSIS**

    **A.  Plaintiff's Breach of Cooperation Clause in Policy**

Liberty argues that the undisputed facts show that by the time Plaintiff submitted this claim, Plaintiff had already removed all of the debris from the alleged collapse, effectively preventing Liberty from inspecting the evidence of the alleged collapse, or assessing the claim based on any information other than the vague description and architectural plans provided by Plaintiff and her agent. ECF No. 74, at 46, 70, 75.

The pertinent language describing the insured's duties in the policy reads:

> **AGREEMENT**
> We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy. ECF No. 65 at 9.
>
> B. **Your Duties After Loss**. In case of a loss to covered property, you must see that the following are done:
>     1. give prompt notice to us or our agent.
>     . . .
>     6. as often as we reasonably require:
>         a. show us the damaged property.
>         b. provide us with records and documents we request
>         and permit us to make copies.
>         c. submit to examination under oath. . .
>
> ECF No. 74 at 32

The Court finds this "cooperation clause" found in the Liberty policy is unambiguous, valid, and enforceable in Washington. *See Downie v. State Farm Fire & Casualty Company,* 84 Wn. App. 577, 929 P.2d 484

ORDER - 6

(1997). The undisputed evidence shows that the collapse in this matter occurred in the middle of January of 2009. Liberty did not receive notice of Plaintiff's claim until July 31, 2009,[5] when Plaintiff finally called to report that her "patio roof" had caved in. By this time, Plaintiff had already removed all evidence of the alleged collapse, precluding Liberty from accurately assessing her alleged loss. Further, Plaintiff also failed to comply with Liberty's requests for documents supporting Plaintiff's claim. Plaintiff also failed to provide the appraisal report and attached photographs for an extended period, and declined to sign a meaningful release authorizing Liberty to obtain these documents, despite Liberty's repeated requests for the same. When the appraisal report was finally provided, it was more than four months after Liberty's first request. The photograph that accompanied the appraisal report, was provided a month later.

Plaintiff also failed to provide the photographs of the collapsed structure that had been taken by her architect, or disclose the fact that she had been planning to replace the awning with a patio roof as early as September of 2008 (four months before the loss). Plaintiff also refused to disclose requested financial information, or sign a release authorizing Liberty to obtain the same, forcing Defendant to subpoena the records after the commencement of this litigation.

It is apparent from the undisputed evidence that Plaintiff (and her son, Mr. Scribner, who admittedly acted on her behalf throughout) both

---

[5]Scribner's alleged instruction to the agent to "delay" reporting an insurance claim to Liberty does not constitute "notice" to Liberty.

ORDER - 7

breached the cooperation duties set forth in the policy as a matter of law. Plaintiff's failures, along with those of her son Mr. Scribner, inhibited Liberty from adjusting the alleged loss. Although Plaintiff now alleges she was not "aware" of the appraisal or photographs, the Court concludes Plaintiff's actions and/or inactions, constitute a breach of the policy. Plaintiff's failure to promptly report her loss until the damaged property had been removed, and her failure to provide information directly relevant to Plaintiff's proof regarding her claim, prevented Liberty from accurately assessing Plaintiff's alleged property damage claim. These actions also caused Liberty to make partial payments to Plaintiff's experts, and resulted in an extremely lengthy and expensive investigation. Plaintiff's actions breached the terms of the policy and resulted in prejudice to Liberty as a matter of law. Therefore, coverage was properly denied as a result of the conduct of plaintiff and Mr. Scribner.

**B.  No Coverage Under the Policy**

The policy issued by Liberty to Plaintiff provided coverage for direct physical loss or damage to covered property, subject to Plaintiff's compliance with the policy terms. ECF No. 65 at 9. However, the loss in this case was not to "covered property." The policy provides in relevant part:

> . . . We do not, however, insure for loss:
> A. Involving collapse, other than as provided in
>    Additional Coverages A.,
>    Collapse

ECF No. 65, at 16.

ORDER - 8

The coverage for loss caused by "collapse" provides in relevant part:

> **ADDITIONAL COVERAGES**
> **A. Collapse.**
> . . .
> 2. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:
> . . .
> e. weight of rain that collects on a roof;
> . . .
>
> Loss to an awning, fence, patio . . . is not included under items 2 b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

ECF No. 65 at 16.

Plaintiff seeks collapse coverage for a loss which the evidence now shows was a collapsed awning. The insurance did not insure for loss involving collapse of an "awning, fence, patio . . ." "unless the loss is a direct result of the collapse of a building." ECF 65, at page 16. Martin Hill, the architect, referred to the patio cover as an "awning." The prior owner Scott Starkey described an awning, clarifying that it was not a roof, it did not run the length of the patio, and that it was a structure to which he would alternately attach a removable fabric canopy or sheets of plastic-type material, depending on the season and his ambition to do so. ECF No. 74-13, at 101 (Starkey Dep.); ECF No. 69-2. Benjamin Steele, a Liberty employee, also described the covering as an awning. ECF No. 69-4.

The word "awning" is not defined in the policy, however, a common definition found in Wikipedia reads:

ORDER - 9

> An awning or overhang is a secondary covering attached to the exterior wall of a building. It is typically composed of canvas woven of acrylic, cotton or polyester yarn, or vinyl laminated to polyester fabric that is stretched tightly over a light structure of aluminum, iron or steel, possibly wood or transparent material (used to cover solar thermal panels in the summer, but that must allow as much light as possible in the winter).

Wikipedia, Awning, http:// en. wikipedia. org/wiki/awning (last visited Dec. 3, 2011).

The cover was situated over a portion of a second story patio and steel piping. Plaintiff states that translucent plastic panels were used and there is evidence from the prior owner that both canvas and plastic panels were used interchangeably according to season/weather conditions. At some point, Mr. Starkey relates he just quit taking the plastic panels down. ECF No. 74-13, at 101(Starkey Dep.).

Plaintiff's claim that the plastic cover on a portion of the patio was left on during the winter and not removed does not change the result that the covering was not a permanent roof such as would be on a home, but was more akin to a shield from sunlight and perhaps the elements. It is undisputed that Plaintiff's covering was over a portion of the patio. Moreover, when a photograph of the area was ultimately provided showing tree damage appearances, it is apparent that the cover was supported by curved poles attached to the house and covered by canvas and/or plastic materials which could readily be removed.

Plaintiff argues that in investigating the matter and drafting the Denial Letter, Liberty ignored the fact that a substantial portion of the

ORDER - 10

$200,000 bid was required by the building code and approved by Liberty's own engineers. Defendant argues it is impossible to determine the costs attributable solely to "code upgrades" versus the cost of the "repair" itself. ECF No. 74, at 68, 71-72. Because the pre-loss structure was an awning with a removable cover, and not like the "patio roof" set forth in Plaintiff's architectural drawings, the Court finds the "required code upgrades" claimed by Plaintiff's representative[6] as necessary for the proposed replacement patio roof, are irrelevant.

The Court finds adequate evidence that the covering was an awning based on the common definition of awning, and the collapsed awning did not result in loss to property contained in a building. Because the relevant policy provisions in this matter are clear and unambiguous, the Court must enforce the terms and conditions of the policy as written. The policy language precludes coverage. Therefore, Plaintiff's loss of the patio covering, which is best defined as an awning, was not covered under the unambiguous provisions of the policy.

**IV.  CONCLUSION**

Having reviewed all papers filed in support of the pending dispositive motions, as well as all papers filed in opposition to said motions, and for the reasons explained above, Plaintiff's claims are dismissed in their entirety.

**IT IS ORDERED**:

1. Defendant's Motion for Summary Judgment, **ECF No. 77**, is **GRANTED**.

---

[6]ECF No. 74, at 10.

ORDER - 11

Plaintiff's claims for breach of the policy are dismissed.

2. Plaintiff's Motion for Partial Summary Judgment, **ECF No. 64**, is **DENIED**. The policyholder, Plaintiff, has the burden of proof to establish bad faith, and the insurer is entitled to summary judgment if reasonable minds could not differ that its denial of coverage was based on reasonable grounds. *Smith v. Safeco Insurance Company*, 150 Wn. 2d 478, 78 P.3d 1274 (2003). The Court finds that the denial of coverage was based on reasonable grounds as discussed above. Given the ruling in favor of Defendants in their Motion for Summary Judgment, Plaintiff's claim for bad faith pursuant to RCW 48.01.030 is dismissed. Plaintiff has also failed to satisfy each of the five elements[7] set forth by *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85 (1986), resulting in the dismissal of her Washington Consumer Protection Act violation claim.

The District Court Executive is directed to file this Order and provide copies to counsel, enter judgment accordingly, and **CLOSE FILE**.

**DATED** this 28th day of December, 2011.

*s/Lonny R. Suko*

LONNY R. SUKO
UNITED STATES DISTRICT JUDGE

---

[7] Under this test, a private citizen must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act. Hangman Ridge, at 784-85, 719 P.2d 531. Id, at 920-921 citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778 (1986).

ORDER - 12